Mr. Cox, if you can give everybody a moment to get settled here, take us just a second. Mr. Cox, if you can give everybody a moment to get settled here, take us just a second. Thank you, Your Honor. May it please the Court. James Cox from Jenner and Block for Wilfredo Romero. Your Honor, this case is before the Court for a second time, and the question presented is whether the agency violated the controlling procedural regulations and directives in its proceeding regarding Mr. Romero's secret security clearance. The interpretation of those regulations and directives is a question of law, and although the background body of security clearance rules is complex, the problem with what happened here is straightforward. The agency never made a final determination on the merits of whether Mr. Romero's secret clearance should be revoked. So in your view, on the remand, what precisely were they required to do? What was the MSPB required to do on remand? Your Honor, I think the MSPB was required to do two things. I think, first, the MSPB was directed to make a legal determination in the first instance for this Court to review of what the regulations and directives required. That legal interpretation is a legal interpretation that this Court would review de novo. Secondly, to the extent that evidence regarding the agency's past practice is relevant to this Court's interpretation of the regulations and any deference this Court might afford to how the agency interpreted the regulations, the Board was directed to develop a record regarding that past practice that this Court would use. But I think in light of what happened in the remand proceeding before the Board, that proceeding framed clear questions of just direct regulatory interpretation that are pure legal questions. Oh, right. And we've got the question of our deference because we're told by the Supreme Court that we should give a great deference to the agency's interpretation of its own regulations. I don't see that the government is claiming that we owe deference to the position they're taking in the brief, which is only signed by the Justice Department and under Adair. We don't give deference to that. I think we don't give any weight to the testimony of the prior officials as to what this meant. The key question seems to be what deference do we give to these internal memoranda interpreting the regulation and whether those memoranda really speak to the issues before us and whether they help you or whether they help the government. Your Honor, first of all, I agree precisely with what you said about both Adair and the deference to the government's position in its briefs regarding the memoranda. I think as an initial matter, for the reasons that we stated on pages 22 and 23 of a reply brief, the memoranda are ambiguous. But in any event, the statements in the memoranda aren't entitled to the deference of this Court applying the rules. Because they're non-public? Your Honor, I think that could be one reason, but I'd like to offer several other reasons within the framework of the Supreme Court's decision in Auer and this Court's decision in Applying Auer. I think in Applying Auer, in which the Supreme Court set out the standards for deference to an agency's interpretation of its own regulations, this Court, as evidenced in the Alpov v. Nicholson decision in 2007, has applied a similar framework to Chevron. And I'll just sort of frame it in terms of Chevron Step 0, Chevron Step 1, and Chevron Step 2, which I think are similar to the steps that this Court has applied in thinking about our deference. And I think the interpretations, to the extent that the Department is claiming that the memoranda are advancing an interpretation under which the revocation of a higher-level SCI, or the denial of higher-level SCI access automatically leads to the revocation of a secret clearance, that interpretation fails under all three steps of the Chevron and Auer analysis. Under Step 0... We're not talking about Chevron here. I mean, that makes a huge difference. We're not talking about Chevron deference. We're talking about Auer deference, I would think. Your Honor, I think that's right, but I think in the Alpov decision and in other decisions, this Court has suggested that many of the same factors that impact whether Chevron deference should apply to an agency's interpretation of a statute control whether deference is due to the agency's interpretation of the regulation, whether the agency was actually interpreting the rule at issue, whether the rule at issue is unambiguous, and whether the agency's interpretation to use the language in Auer is plainly inconsistent with the rule in question. At the first of those steps, I think the agency's interpretations in these memoranda are not actually interpretation of the controlling regulations and directives because the... First, because of problems regarding the timing of when these memoranda were issued. Two of the three memoranda in question, the Munson Memorandum and the Winneburger Memorandum, were issued in 1996. Before, in 1998, there were substantial changes to Director of Central Intelligence Directive 6-4. In fact, Director of Central Intelligence Directive 6-4 didn't come into existence until 1998, replacing a prior directive, and it affected a significant change in the relevant standards governing access to SCI. Specifically, it includes a direct statement, which you can find on JA-45 in Annex F, Item 1E of the new DCID 6-4, that says failure to meet an additional but not duplicative requirement may not necessarily affect a person's continued eligibility for a lower clearance. And that statement in DCID 6-4 was put into the regulations for the first time. What page of the appendix was that on? JA-445. That provision was added into the regulations for the first time after the true 1996 memoranda were issued, and affects the validity of that guidance. Can I interrupt? And I hope I'm not cutting you off for something that Judge Dyke wanted to hear, but time is limited. So let me, if you forgive me, shift you. Where does all, accepting everything you say about how you're construing the regulations, does that just get you to the point where you're saying that it was incumbent on WHS to do its own analysis with respect to the lower level security clearance? Is that where this all gets you? Yes, Your Honor. Okay. So assuming that's what we had in mind also, maybe, on remand, that they have to determine whether the internal procedures were violated. So you say, yes, they were violated because WHS didn't do its own interpretation. Then we get to whether or not this is harmless or harmful. And it seems to me the ALJ at the MSPB concludes that even if they had adjudicated the clearance based on the information available, the WHS would have revoked his secret security clearance. So it seems to me they did what we asked them to do on remand. They assumed even if the procedures were violated, if they had complied with the procedures, the result would have been the same. Why is that not the end of this case? Your Honor, because I believe that's not a determination that the MSPB can make. And I think the government in its brief has acknowledged that that's not a determination the MSPB can make. Under the Supreme Court's decision in Egan, both the board and this court are prohibited from intruding into the executive prerogative of the substance of security clearance determination. So how could they have analyzed whether or not it was harmful? I mean, is what's the piece missing here that they needed to get an agency official from WHS on the witness stand and he has to have testified that he would have reached the same result? This is the analysis he would have gone through and this is what he would have done? Your Honor, I think at least that would have been required. And I'm not sure that even that would have been enough. So what's enough? I mean, how do we do the harmless error evaluation? Even assuming that you're right about the procedures, that they were compelled to independently make an evaluation of the security clearance. Your Honor, I think there are two points. First, I think this is the kind of error that is not susceptible to harmless error analysis. Yeah, but I think that's way beyond where we are here. I mean, you could have taken, I guess, the initial opinion up to the Supreme Court. But now that's the law of this case that this analysis is required. So let's leave that. I understand you make that argument, but I don't find it particularly persuasive. So let's move on to how harmless error applies here. Your Honor, if I could just briefly say, I think whether harmless error could be applied depends on the specific procedural error that was identified. And I think the court needs to look at the specifics of the procedural error that we've come to after the proceeding of the MSPB. But regardless of that, I think the harm to Mr. Romero here comes from the fact that the standard for a secret clearance is substantively different from the standard for SCI access. And because the agency never actually made that initial determination of how to apply the standard for the secret clearance, that's a discretionary determination. The regulations governing a secret clearance say that the considerations that play in this case, an immediate family member who is a citizen of a foreign country or associates who are connected to the foreign government. Your point is there's no testimony in the record that they would have reached the same result if they had taken the correct standards into account, right? That's correct, Your Honor. And I think the government's brief, I think, illustrates that precise problem because the government sort of continues to say, and relying on the testimony of the agency officials who testified here, that the regulations mean something different from what the plain language of the regulations suggest. And as a result, I think to the extent that the department is saying it would have come out the same way with respect to the secret clearance, that conclusion can't be divorced from the fact that the agency is continuing to push what, in our view, and I hope in your view, is an inaccurate interpretation of the relationship between the regulations governing SCI access and governing the secret clearance. Go ahead, please. I've asked a lot. Go ahead. Well, I mean, but the MSPB made a finding, I think, as I read it, in the alternative. It's their opinion of page 40 where they said even, I think they sort of accepted your analysis of what procedures were required and then made a finding, a factual finding that if they had adjudicated the clearance based on the information then available, they would have reached the same result. Is your position that if they had had six witnesses from the agency that testified to that and the AJ had added, and I believed what so and so said, and that's why I believe it, that you would accept that that would be sufficient? Your Honor, I'm not sure that that would be sufficient, but I think that would be a different case. I mean, you sort of understand our general position that this kind of error isn't susceptible to harmless error analysis, period. Setting that aside, I think if you disagree with that, then yes, if the agency had said authoritatively in 2005 this is what we would have done, then that might be enough if this error is susceptible to harmless error analysis, but that's not what happened here. There's no authoritative interpretation from the agency, even at this stage, saying that Mr. Romero's secret clearance should have been revoked and would have been revoked in 2005 if the agency had actually considered the question. Seems to me there are two separate issues here and they don't necessarily get teased apart in the briefs, but the way I'm looking at this case, you can say, okay, the problem here is that DIA, in the presence and through the person of ultimately the PSAB, excuse me for all the acronyms, but that's dealing with the Defense Department, that's always the case. All right, so the PSAB decides the SCI issue and then per the money memorandum, at least according to the government, that automatically predominates any further inquiry by WHS. And so WHS-CAF just sends a letter pursuant to the Winterberger decision as PSAB automatically. And you don't like that because you say, no, no, there was no separate inquiry into the security clearance issue. It was all dictated by SCI. There's a second approach to the problem, which is to say, well, wait a minute, DIA all the way through was saying that they were deciding both issues, both security clearance and SCI. And that went all the way up to the Doha, which focused almost entirely on the security clearance issue. And then you have Winterberger who says, I affirm the DIA and the Doha, but in his referring to upholding the decision of the agency in Doha, he said he only refers to the SCI. Now, those really strike me as two separate rationales. Let me ask you about the second one. You've talked a lot about the first. If you view, as the administrative judge did here, you view Winterberger as having, in effect, either accepted or acquiesced in the decision of DIA, where you now have an agency, not WIHS to be sure, but a different agency making an explicit determination with respect to security classification, why doesn't that satisfy any of the procedural requirements? Your Honor, two responses. First, I think the conclusion that that is what the DIA SAB was doing in its final decision, which is the only action of the DIA that carries the force of law is that final decision signed by Winterberger. I think reading that decision, it is not a reasonable inference to say that the DIA actually was intending to adopt the findings. Do you think that's a factual issue, a factual question, how one interprets that document? No, Your Honor. I mean, I think that's a legal decision. That's the agency's final decision of law in this case. And I think the meaning of that final decision in the same way that the meaning of a district court's order would be a question of law for this court to consider. I think the meaning of that final agency determination is a question of law first for the board to consider and then for this court to consider. The second problem, I think, is that as we argued in both of our briefs under Section C7.1.2.3 of DOD Reg 5200.2-R, the WHS was the component that was required to make this decision. But to make that argument, you have to reject the argument that C123 is limited to military, right? That's correct, Your Honor. All right, but if you're wrong about that, and the A.J. rejected that argument, but if you're wrong about that, then you're left with the argument that the A.J. was wrong in his characterization of what Winterberger was getting at, in effect, by affirming a decision that did explicitly deal with the security classification, right? Your Honor, I take issue with the characterization of this decision as affirming. It doesn't say sort of categorically that it affirms any lower decision or adopts any lower decision. It says specifically the determination that you do not meet the minimum personnel security standards for SCI is affirmed. Do you read the lower level decisions as addressing the secret clearance as well? Yes, Your Honor. I think both the decisions of the DIA-CAF and the recommendation of the Doha administrative judge did address both the secret clearance and SCI, but sort of in much the same fashion as you have under immigration law with the decision of an ALJ there versus the Board of Immigration Appeals. As soon as the DIA-SAB acts, the DIA-SAB's decision is the only decision of record, and what's in those other decisions is not a final statement of the agency's adjudication of the case. So I think you have to look at what's on JA-53. That's the DIA-SAB's final decision, and within the confines of that document, sort of determine if that document addresses the secret clearance. I think because it never uses the word secret clearance and because the test that it describes in paragraph two much more closely tracks the test for SCI access than it tracks the regulatory test for a secret clearance, I think it's clear that this document is just addressing the SCI issue. I thought that the SCI disqualification was automatic based on foreign connection and that the security clearance was the area in which mitigation was a consideration. Isn't that right? Yes, Your Honor. And it would seem to me that since the SAB refers to mitigation in the second paragraph, it's reasonable to read that as addressing the problem that DOHA itself was addressing, is it not? Your Honor, I think the key sentence to look at in the second paragraph is the second sentence. Which page are you on? We're on page 53 of the joint appendix where the DIA-ASAB says the foreign influence standard applies and mitigating factors do not apply. Not you have failed to mitigate, which was the finding of all of the lower bodies, but mitigating factors do not apply, which I think is exactly a statement of the standard of the per se rule that's applicable in the SCI context, rather than the may disqualify in some circumstances depending on an evaluation of the whole person, including mitigating factors standard that applies in the secret clearance context. Now, I guess maybe I read that differently from where you're reading it, but I understood that, and I want to go through the entire DOHA conclusion here, but correct me if I'm operating on a misapprehension of what DOHA did. I thought that they said, okay, if you are married to a foreign citizen, that's SCI, you're out, but security clearance mitigating factors may operate. However, if you're married to someone who is an agent of a foreign power, then mitigating circumstances don't come into play at all. Isn't that correct, a correct reading of what DOHA did? DOHA was directed almost entirely at the security clearance issue, and it seemed to me there were two steps to the analysis. One is, are you married to a foreign citizen as to which, with respect to security clearance, mitigating circumstances come into play? But then saying, ah, but here it wasn't just any foreign citizen, it was an agent of a foreign power, therefore different analysis, and I had thought that is what Weinberger was referring to when he goes to the second sentence that you just read from. Isn't that right? Maybe I'm misreading it. Your Honor, I think in my reading of both of those decisions, I think that as long as we're still in the secret clearance world, there still is a consideration of mitigating factors, and how those mitigating factors are considered depends on the specific considerations at issue. And here I direct you to JA343, which is Appendix 8 of DOD Regulation 5200.2-R, which lists a number of factors that may be disqualifying and could raise concerns, but are not per se disqualifying. And one of those factors is relatives, cohabitants, or associates who are connected with any foreign government. So under that regulation, the analysis it's specifying is if you have a spouse or other relative who is a citizen of a foreign country or who is connected with a foreign government, the general analysis of evaluating the whole person, considering mitigating factors, is still what applies. And my understanding is that that was what Doha was doing, and that's sort of not what was happening in the second paragraph of the DIA-SAP's decision. Well, let me just – I hate to spend so much time, but we're over, so we'll do it a little more. But I hate to spend so much time focusing on this one very specific area, but it does seem to me to be a critical point as to exactly what one interprets Winterberg as having done. If you read the one-two-third paragraph of the conclusions on JA-51 of the Doha, down one, two, three, four, five lines – four lines, I'm sorry – Doha is referring to the mitigating condition and says because she is an agent of a foreign power, the mitigating condition is not applicable. Okay, and then when you go over to Weinberger, you see Weinberger saying that, as noted by the administrative judge, the foreign influence standard applies and mitigating factors do not apply as your wife is by definition an agent of a foreign power. That seems to me responsive directly to the discussion by the administrative judge of the Doha to the security clearance issue. Is it not? Or is that not at least a reasonable reading of what Weinberger is saying? Your Honor, I think – You understand that – I do understand what you're getting at, Your Honor, and I think to the extent that that is a reasonable reading, I think that would just indicate that there are multiple reasonable readings of what Weinberger is saying, and given the sort of statutory and regulatory due process requirements, I think to say a decision that never uses the words secret clearance and is susceptible to several possible interpretations of what it's talking about in the details, to say that that is a decision on the merits revoking Mr. Romero's secret clearance, and on the basis of this final agency action, Mr. Romero's secret clearance was revoked, I think that would be contrary to those statutes and regulations guaranteeing Mr. Romero due process. Can I just ask one other quick thing because I've gotten probably more confused rather than less confused as the discussion has gone on? Is it true that for a regular security clearance, is it an automatic disqualification if your spouse is an agent of a foreign power? Is that what the statute says that they're referring to? Your Honor, that statute simply includes a definition of what agents of a foreign power mean. Well, what is your view? For a regular security clearance, a secret clearance, is it an automatic disqualification if your spouse is an agent of a foreign power? Your Honor, my understanding is that sort of the two factors that go into that, the citizenship of the spouse and whether the spouse is connected with any foreign government, are among the factors that are considered in the sort of totality of circumstances. The answer is no. It's not on that. That's correct, Your Honor. That's my understanding. Those are factors that could be considered. Correct, Your Honor. And it's entirely possible that in that situation, a security clearance never would be granted that determination, but that's a contextual determination that must be made based on the consideration of the full record of the whole person, consistent with Appendix 8, which, again, you can see at JA 343. Very well. We will hear from the government next. Ms. Hosser. We will reserve. Mr. Cox will restore your rebuttal time. We ask a lot of that. Thank you, Your Honor. May it please the court. The court should affirm the board's decision because the board correctly concluded that the agency followed its internal procedures in revoking Mr. Romero's secret clearance. Now, the court has raised a number of questions here during the course of Mr. Cox's presentation, and I'd like to just briefly address some of those. First, as the court recognizes, the foreign agent issue would not result in automatic revocation of the secret clearance. The foreign agent analysis came under the foreign influence standard, which is in Appendix 8 to DOD 5200.2. So what is your answer to my last question, which is, would it under, for a regular secret security clearance, would a spouse who is a foreign agent automatically revoke, or would it still be just a factor to be considered? It would be a factor to be considered. But what's key to this case is to recognize that the adjudicative guidelines are common for both the SCI access eligibility determination and the secret clearance determination. Well, not really. I mean, the standard is different, as I think you just admitted, that for SCI, it's automatic. But for a secret clearance, it's not. No, Your Honor. For SCI, the fact that your wife is a foreign agent is not an automatic disqualifier. Under SCI, during the nomination process, what normally happens is the agency looks at whether or not your spouse is a foreign citizen. That's a different analysis than the foreign influence standard that's applied under Appendix 8 of 5200 and NXC of DCID 6-4. It's in a different section of DCID. It's 5B. It's a nomination standard, as Mr. Scheller testified at the hearing. So, can we focus on the sentence that Judge Bryson was focusing on in previous questioning? Yes. In the Weinberger memo? Yes. Where he says, the foreign influence standard applies, and mitigating factors do not because she's an agent of a foreign power. Is that the standard for SCI? It's a standard for both. How do we know that? Because the common adjudicative standards apply both to SCI access and to... I'm not understanding. I really don't understand this. I thought it was quite clear that SCI was automatic. The only thing that's automatic under Section 5B, if we could go to DCID... Okay, if you go to JA400, and you go to 5, Personnel Security Standards. This is the only place where there's a requirement that applies to SCI that does not apply to the Secret Clearance. And it basically says that the individual requiring access to SCI must be a U.S. citizen. That applies also to Secret Clearance. B, the individual's immediate family must also be a U.S. citizen. That consideration was undertaken by the agency. But at the same time, they went through the full adjudicative process, which requires an investigation. Wait, wait, wait. I'm not understanding this. It says his wife was not a U.S. citizen, right? Correct. So why isn't this disqualified for SCI clearance? Because as Mr. Scheller testified at the hearing, that determination is made at the nomination stage during the course of a personal interview process. What's the difference? I don't understand the difference. Because here, notwithstanding the fact that Mr. Romero's wife was a foreign citizen, they still went through the whole process of determining whether or not he was eligible for access under the Common Adjudicative Guidelines. Access to SCI or access to classified? Access to SCI and access to a Secret Clearance. But DOHA seemed to be under the impression that it was automatic. Because I read the following sentence to you. Under the DCID 64, individuals with foreign immediate family members are precluded from obtaining access to SCI. Is that wrong? It's a nomination standard. That is not completely right. What happened was, if you look at the decisions that preceded the DOHA decision, in every single decision, foreign influence, as well as his wife's citizenship, were the reason why he was being denied access to SCI and his Secret Clearance. Foreign influence applies equally to both. The DOHA judge, at some point, because the citizenship of his wife was considered, there was a compelling need determination request made. But it was in the middle of the Common Adjudicative process. Suppose we reject this position that you've just taken, and we conclude that for SCI it's automatic and that for Secret Clearance it's not. You agree with the latter. Then do you lose? We do not lose. Because in this case, notwithstanding the fact that it would be automatic for SCI, the DIA still applied the Common Adjudicative guidelines, and that's why in the SAB decision you see that— But it's not clear that they applied the correct standard, is it? No, it is clear that they applied the correct standard. The correct standard that we've just assumed? They both apply. The foreign citizenship of your wife applies under 5B. The question about whether or not— Where does that decision make the distinction between the two standards? The Winneberger decision? Yeah. Okay, let's turn to page 53. As Judge Bryson did when Mr. Cox was standing up here, if you look at the SAB decision in conjunction with the DOHA decision that it affirms, the DOHA decision— Where does it affirm? Let's start with that point. I mean, what does it say about the DOHA decision? Well, it says— It says the only word affirmed that I see, so you can point out to me why I'm wrong, is the original determination that you do not currently meet the minimum personality standard for SCI is affirmed. Right. So the reference to affirming is linked to SCI, is it not? You have to read it in context. It says the SAB concluded that you failed to mitigate the foreign influence— So you're talking about paragraph 2. Okay. Foreign influence security concerns. As noted by the DOHA administrative judge, the foreign influence standard applies and mitigating factors do not apply as your wife is by definition an agent of a foreign power. Now, if you go back to the DOHA decision, yes, the DOHA decision did say with respect to SCI access, your wife is a foreign citizen, and that's different from her status as a foreign agent and an employee of the Honduran embassy. Because your wife's a foreign citizen, you don't qualify for SCI. But then the DOHA judge went on and examined the secret clearance in the context of the common adjudicative guidelines, which apply— Where does the administrative judge recognize that a different standard applied? Again, under my hypothetical, for SCI and secret, where is there a recognition that there's a different standard? The DOHA judge recognizes that for SCI access, your spouse's citizenship is a factor in the very first paragraph under conclusions. But where does it—you're not answering my question. When it gets to the foreign influence standard, it's not different. It's not different. So he doesn't recognize that there's a different standard for SCI and secret. Correct. He assumes that the nomination disqualifying standard of foreign citizenship of the wife put Mr. Romero out of SCI access. But then he goes on and examines the foreign influence standard in the context of the secret clearance. Now, the SAB, correctly, I think, also examined foreign influence in the context of SCI access and said, look, it applies here, too. So the fact that the SAB made a determination on foreign influence and then that standard applies equally to SCI and secret clearance means that it was rejecting both. And you have to look at this in the context of the Munson memo. Can I move you off a little bit to a different point so you can include that? I mean, we've got the board decision. And on certain issues, it's entitled to some deference and others not. Well, the board deals with this question on JA31. Yes. I'm just wondering what level of deference you think, if any, they were entitled to. I mean, what they seem to come out is they never specifically referred to it, but there's nothing to indicate they didn't. And then they say, rather than interpreting the silence with regard to his secret clearance as disagreement with the AJ, I find it more likely to be evidence of agreement. Well, they didn't discuss the possibility, which is that it's nothing. I mean, there's agreement, there's disagreement, and then just the failure to articulate any judgment with respect to it. I think the key here is that the board found that the revocation of the SCI access under the common adjudicative guidelines applying the foreign influence standard here automatically revoked the secret clearance. When you say board, you mean the MSPB here? The board agreed with the agency. If the agency's interpretation is entitled to deference because it's interpreting its own regulations, it's not interpreting a statute, and unless that interpretation clearly conflicts with the regulation, then it's entitled to deference. Which regulation are we talking about interpreting here? DOD 5200.2-R and DCID 6.4. Now, there are two points I want to make. First, I want to just get to the one regulation that Mr. Cox cited that he claims somehow precluded the agency from taking the action it did here. Can you just go to my point first because I'm really confused about this paragraph on J31. This is the MSPB. The MSPB says there is nothing in that decision. So are we talking about what maybe I'm talking about? Is that Weinberger's decision? I'm sorry, are you on J31, Your Honor? Yeah, last paragraph. Yes. Is this the reference to the Weinberger memo? Yes. He's talking about the Doha Administrative Justice decision and then the SAB decision. Yeah, so it says there is nothing in that decision to indicate the SAB disagreed with Doha. That's correct. Right. But that begs the question about whether there's anything to indicate that it agreed with Doha, right? The finding on foreign influence shows that it agreed. Well, do they say that? I don't know that the foreign influence. I mean, they have one sentence referring to foreign influence, but it doesn't seem to. But if you look at J32, the board says that Mr. Romero has failed to show that the DIA CAF's denial of his SCI eligibility did not automatically revoke his collateral access. That's another basis for its decision. Those are two different grounds. No, because under the Munson memo, when your SCI access is denied, your secret clearance is also denied. When I say two different grounds, there are two legal theories here, it seems to me, that you could be presenting to us. One is that Weinberger did affirm what Doha did and that Doha did revoke his security clearance. A second legal theory that you could be presenting is the one that you just alluded to, which is it wasn't necessary for either Doha or Weinberger to say anything about security clearance because it was automatic. As soon as he said the words no SCI, then WHS CAF was locked in to having to revoke security clearance, correct? I don't think those theories are mutually exclusive. Well, they're not mutually exclusive, but they're different routes to where you want us to go. I think they're both correct, and I think we should look at them. They require us to draw different conclusions about the record in order to get to the conclusion you want us to reach. The first requires us to read Weinberger's affirmance, if it is, of Doha as incorporating an affirmance of the security clearance. The other requires us to read the regulations and the memos as making that step unnecessary, correct? I think that you can read the SAB decision that applies the foreign influence standard in the context of SCI as also applying to the secret clearance. Wait, wait, wait. On the second alternative that Judge Bryson described, if you are wrong about the equivalence between the SCI standards and the standards for secret clearance, that second argument goes away, does it not? No, because the Bunsen memo dictates that SCI, I'm not, Your Honor, with all due respect, I'm not wrong. The foreign influence standard applies to the equivalence. If the foreign influence standard didn't apply to the secret clearance, then there may be a problem with the Winneberger memo, but it does, and all the testimony at the hearing confirmed that. That was the whole point of DOD change three that came in the wake of executive order. And where does the board deal with that? Where does the board confirm that that's its conclusion, the AJ that is? Page 32. Which we're on? He says that the... What paragraph? Okay, first the court was talking, was referring to page 31. Right. At the bottom of page 31, that's why, I mean, that seemed to me to be the board's conclusion that they were concluding that I find it more likely to be evidence of agreement or at least acquiescence. So they were looking at the first question that Judge Bryson has posed, whether or not they decided that question, right? Right, on page 31. The whole discussion that Your Honor has referenced is in the context of the application of the foreign influence standard. And when you understand that the foreign influence standard applied equally to the SCI access and the secret clearance, that's what made the board reach that decision in conjunction with all the testimony at the hearing by agency officials who were involved in the process and who were charged... But you're reading all of that. I mean, I'm just, I'm looking at the words they used. It says further, given that the Doha Administrative Judge's decision is less than four pages long, it seems unlikely that the SAB did not notice that the Administrative Judge had found the appellant ineligible for a secret clearance due to foreign influence security concerns. Right, okay. So given that it's less than four pages long, I mean, they're drawing an inference based on the length of the pages. I mean, I'm not sure, I don't read that as being what you've been telling us for the past five minutes. Right? I mean, what are you reading? Are you reading something into this? The board judge was persuaded by the fact that both the Doha judge's decision and the SAB decision apply the foreign influence standard and find there are no mitigating factors. And Mr. Cox's claim that the SAB found that mitigating factors don't apply, meaning they never even looked at them, is just totally inconsistent with any reasonable reading of that document or with the Doha judge's decision. But then we should also look at it in the context of the Munson Memo. I think Judge Steik has a question. Judge Steik. Well, I was going to lead you to a different topic, so why don't you finish your talk. Okay, if I could just direct the court to JA501. And this is the Munson Memo. And Mr. Cox said, well, the Munson Memo can't be viewed as a valid interpretation of DOD change three because it came out slightly before or about the same time. But if you read the memo, it clearly states that the whole point of this memoranda, which is authorized under DOD 52-point- Well, change three is what's referenced in the memo itself. I know, but his argument is, he can correct me if this is a mischaracterization, but I thought that his argument was that this comes before DCI 6-4. DCI 6-4 was preceded by DCID 1-14, and I don't think there were all that significant differences. Okay, but. But that doesn't make sense. But where does the Munson Memo say that if there's a different standard for the two security clearances, for SCI and secret, that you would automatically take the denial or revocation of the first one as automatically requiring revocation of the second one? It doesn't say that if there's a difference in the standard because there is a difference in the standard. Exactly, that's your problem with the argument. If we conclude that the standards are different, I don't see how you can read this memorandum as saying that the revocation is automatic. This is what the memo says. Therefore, whenever DIA denies or revokes SCI access- This is on FA, JA 501. JA 501, the first full paragraph. In the future, for personnel assigned to the OSD staff, the joint staff, or the defense agencies, and here's the key language, using the common due process procedures contained in change three to DOD 5200.2-R, it will be unnecessary for the WHS-CAF to repeat the process. However, it will be necessary for the WHS-CAF to advise the individual in writing that his or her security clearance has been effectively revoked pursuant to the due process action already administered by DIA. But your reading of that is based on the notion that the SCI standard and the secret clearance standard are the same. And the hypothetical that I asked you about a few minutes ago is that they're different. So the standards are different. Why in heaven's name would you say that the revocation of the higher clearance results in a- or denial of the higher clearance results in a revocation of the lower clearance? It's not saying that. If the standards are different, that would be a difficult argument to make. But let's go to page 503. Differences in adjudication standards. Discussion. While the adjudication standards of both doc- The issue. The adjudication standards in DOD 5200.2-R for security clearances are those in DCID 114, which is the predecessor of 64, versus SCI are different. Discussion. While the adjudication standards in both documents are similar, there are some significant differences. This situation has resulted in the belief that the DCID 114 guidelines are more stringent than those in the DOD 5200.2-R, and thus the need for a second adjudication and due process for the security determination. Solution. The publication of the new adjudicative guidelines, approved by the Security Policy Forum, for the first time establishes a common baseline for security clearance and SCI access determinations, thus promoting reciprocity of both. There couldn't be a clearer statement of the agency's interpretation of the regulations as they applied secret clearances and SCI determinations. When the common adjudicative guidelines are applied from Appendix A to 5200, and NXC of DCID 6-4, and in this case they were, because we see the reference to foreign influence in both the DOHA decision and in the SAB decision, then they are the same standards. They are not different. Let me just summarize. So your position is that even if we assume that we characterize the standards for getting a DCI, a higher level clearance, are higher than a regular security clearance, once you don't get the higher one, you automatically can't get the lower one? As long as the common adjudicative guidelines are applied. As long as the standards that apply to both are applied. And in this case foreign influence was applied. It was found that there was a problem with his wife being an agent of a foreign government and he did not mitigate that. Wait, can you repeat that? As long as the what are applied? No, no, no, before you said that. As long as what? What is the common adjudicative guidelines? And if you look to JA 343 and JA 424, those are the pages that talk about foreign influence. That applies equally to a secret clearance and SCI access. The thing that you're pointing to now seems to be dealing with reciprocity with respect to top secret and SCI access. That's the heading of the 502. Top secret is a prerequisite for SCI access. Right, but that's just talking about the fact that, well, that's number one. If you look at number two. You're focusing on three, I take it. Yeah, three is differences in adjudication standards. I take it your takeaway from 503, section three. Your takeaway from that is there may have been either a perception or even the reality of different standards in the past, but we fixed that. That's what the point of change three was to DOD 5200.2-R. That was what Executive Order 12968. See, Mr. Cox seems to have a problem with this procedure. The court is not here to evaluate the validity of the procedures. In fact, the court doesn't have authority to do so. At least DCID 6-4 says that these procedures are not subject to judicial review, and the court already found in the original Romero decision that the executive order was not subject to judicial review. The processes are what they are. The agency followed those processes, so therefore, the board's decision should be affirmed. I want to bring you to this other point I was going to get at a minute ago, and that is the regulation that raises the question of whether or not – this is C7-123. Yes. The earlier part of this regulation says all provisions – it's on page 219 – all provisions of this regulation apply to DOD, civilian personnel, members of the armed forces, excluding Coast Guard personnel, blah, blah, blah. So why shouldn't we read C7-123, the second sentence, as applying to civilian personnel? Because that particular provision clearly states that it applies to military personnel. But even if C7.1.2.3 could be construed as somehow applying to civilian personnel, in this case, through the Winneberger and Munson memos, there was a clear delegation of authority to the DIA to adjudicate secret clearances, in addition to SCI clearances, from members of the WHS staff. There's a delegation here. I know the court has an issue with – Where is the delegation reflected? In the Munson memo and the Winneberger memo at JA459 and JA501, 502. In this case, there's no question that the WHS permitted DIA to adjudicate, because only DIA could adjudicate SCI. WHS could not adjudicate SCI. So in the spirit of DOD change three, as well as EO-12968, they said, okay, because you can do SCI, and because these common adjudicative guidelines apply, do the whole thing. And if you look through the process, if you look at JA44, the whole sequence of correspondence leading up to the SAB decision – Why doesn't the money memo seem to limit this to clearances at the same level? The money memo isn't as clear as the Munson and Winneberger memos, but it certainly doesn't conflict with them. I mean, I know that's Mr. Romero's argument, but there's no conflict between the money and Munson and Winneberger memos, and there's no evidence that the Winneberger or Munson memos were ever superseded. And agency officials came in and said they were not superseded. So money just talks about reciprocity in more general terms. And then just the last provision I wanted to reference was DCID Annex F Section 1E that Mr. Cox referred to. Where is that in the appendix? JA445. That applies only when you're talking about one agency reviewing an SCI access eligibility decision made by another agency. It doesn't even address the issue of secret clearances below it. It just says when one agency has looked at SCI and they have an additional requirement, then you may have to consider that in looking at SCI with another agency. But you can still use the investigative files generated by the first agency. It has nothing to do with the issue that is here. Can I just close out my question at least by just taking you away from this? Let's assume that looking back at the remand opinion and what the MSPB was supposed to do, let's assume we disagree hypothetically with everything you've said this morning, and therefore we find that there was a problem with the procedures and that it was not, indeed there wasn't adequate consideration by WHS of the question of security clearance. Where do we go with the harm? Even if we assume that, is your position still that what the board did on remand was adequate to establish findings, there was no harmful error? Yes, because during Mr. Cox's presentation, one of your honors asked, is there any evidence that the WHS looked at this process after the SAB decision was issued? And there is. If you look at transcript 490, which is at page JA178 of the joint appendix, Mr. Smith, the individual who issued the letter saying, hey, SCI access has been denied, therefore that's a final revocation of your secret clearance, testified at the hearing. What page is that again? It's JA178, which is page 490 of the transcript. He provided affirmative testimony. Wait, wait, wait. And I'm just paraphrasing here, but he said initially. Show us where the actual testimony is. Okay, that's good. I'm sorry. JA178. And page 490, did you say? Yeah, I was focusing. Let's see. Yeah, he talks about the process and the use of the common adjudicative guidelines, and he says they looked at the basis. What line are you on? Okay, he says line two. Okay, nothing such as a decision is taken at face value for reciprocal acceptance within WHS-CAF. What we do is look at the basis. We examine the documentation that we received. In this case, according to the Munson memo, there were several things we had to ensure before the so-called reciprocal acceptance. Obviously, DIA had to adjudicate using the federal adjudications guidelines, the common guidelines, no special DCI parameters that used to exist for adjudication. We also had to ensure the due process was met, specified within the memorandum. So as long as we had the documentation trail to show that and we had a good faith reason to believe that that had all been accomplished, then we could go ahead and do the action that was upon us. Okay, but my question, I'm sorry, maybe I wasn't clear. My question was let's assume that they didn't do the right thing at the time. I was focusing on the harmless error. This shows there was harmless error because WHS, before it actually issued the final revocation, said we've looked at the process. I mean this is what they'll do if they have to go through. I think what Judge Prost is saying is suppose they had to make an independent determination. Why is the failure to make an independent determination as hypothetically required harmless error? Because the determination was made here. The whole record shows that the foreign influence standard. That's a different argument. That's not a harmless error argument. The only error that could potentially have been made here was the SAB's failure to use the word secret clearance in its decision. But if you read it in the context of the memorandum. No, that's not the only issue. The contention is that the agency had to make its own independent determination. And if they are correct about that, the question is how could the failure to make an independent determination be harmless error? Because the determination was made under the common adjudicative guidelines and the agency could not have made it any different. The common adjudicative guidelines apply equally to both. What I'm saying is let's assume that they messed up in some way, shape or form. Let's assume that hypothetically we all agree to that. I guess my question goes more to if you're evaluating harmless or harmful error, do you agree with me that the agency should have put on witnesses, this is what I discussed with your friend on the other side, that the agency should have put on witnesses and said if we had done it, if we had done what you now say that we were supposed to have done, we would have revoked his clearance? And isn't that what we mean by harmless error? To a certain extent, that's correct. But the problem here is then that would require the agency to get into the merits, which Egan says this court is not allowed to review and the board was not allowed to review. Well, not necessarily. We're not going to evaluate whether or not their analysis is reasonable. The question is whether or not they are going through some process. They're making a decision. You're right. We're not allowed to go behind that decision and say no, we disagree. But whether or not the decision was ever made and whether or not they say they would have reached the same result, doesn't that necessarily go to whether or not it's harmful? If the record were inadequate on that issue, then yes. Then there would have to be some sort of determination. There isn't a testimony. Is there that they would have reached the same decision if they had been required to make an independent decision? There's Mr. Smith's testimony. He was the official at WHS. The testimony you just showed us? Yes, and he says he looked at the substance. I don't see that it says that. Where does it say that? You know, I apologize, Your Honor. I'd have to look back at my brief. But it was clear that they didn't just gloss over. They looked at all the documentation. And the documentation includes the substance of the reasoning. But he seems to say that he was deferring to the DIA, the Winneberger determination, right? He's saying that he reviewed all the documentation all the way through, but that documentation just didn't say no, no, no. But he doesn't say if I made my independent determination, I would have reached the same result. I can't say that on this record that that is there, but it's not necessary. Well, yeah, we understand that's your position. Let me ask you one other question. At page 52 of your brief, you say that you disagree with the decision that ultimately got us here for this whole proceeding, which is that the court had previously said the board may review security clearance decisions for compliance with internal agency procedures. You take issue with that? Well, obviously, we didn't petition for a hearing in bank or pound. Well, but do you think it's wrong? Yeah, we believe that security clearance terminations, even the procedures, are under EEG and exempt from. Even procedural compliance with the requirements of the agency for determining whether the security clearance ought to be revoked, as opposed to the merits of the security clearance? As in this case, it forced a review of the merits. We've been talking today about foreign agents and foreign influence and the actual reasons why the agency denied the clearance. Well, we're not second-guessing the merits of what the determination was. What we've been trying to do this morning, I think, is figure out what they decided, if anything, not the merits of that decision. Let me see if you disagree with this proposition, that the board can determine whether the agency has procedures for denying or revoking clearances and whether the procedures were followed. That's what the court decided in the Romero decision. But do you think that's wrong? When the case was presented at the time, we said we took the opposite position. And you still think it's wrong? We believe that security clearance determinations, which are— It's a yes or no question. Do you think it's right or wrong? You think it's wrong. We believe it's wrong. But that language is taken directly out of the solicitor general's brief in Egan. I understand that. And you take a different position? You think the solicitor general's brief in Egan is wrong in that respect? I don't think I can stand here and say the solicitor general's brief was wrong, but that issue really wasn't presented in that case. The whole issue in Egan was whether or not the court could get to the merits. But if the issue wasn't presented in Egan, then Egan doesn't foreclose it. Well, right, but our position is that— a logical extension of Egan is that when you venture into the procedures that are used, you necessarily venture into the merits. But obviously we did not appeal or petition for rehearing of the first Romero decision. Very well. Thank you. Thank you. Mr. Hotsford, we'll hear from Mr. Cox on rebuttal. Thank you, Your Honor. I want to start with harmless error and start on pages 178 and 179 of the joint appendix where Ms. Hotsford directed you. On page 179, continuing the testimony from Mr. Smith that she cited, Mr. Smith says, DIA's action was the action— Wait, what page? I know you're on page 179. Oh, I'm sorry. 491 is the very top of the page, starting in the second line. DIA's action was the action for the Department and required absolutely nothing on our part, meaning nothing on WHS's part. That's why I use the term administrative housekeeping. I think it's clear that the substance of Mr. Smith's testimony is that WHS made sure that DIA had complied with the procedural requirements of the common adjudicative guidelines, but that not the WHS ever made any kind of independent substantive determination of whether Mr. Romero was entitled to a secret clearance. As a result, I don't think that testimony establishes anything about what the decision would have been had the government counterfactually actually made a determination of whether Mr. Romero was eligible for the secret clearance. And this relates back to change three, which Ms. Hotsford referred to frequently. I think the effect of change three in the common adjudicative guidelines was to set up a common process whereby the same due process requirements would be followed in the adjudication of all clearances so that you wouldn't necessarily have to have a different process for a secret clearance as for SCI. But as the differences between DCID 6-4 and DOD Regulation 5200.2-R make clear, it did not set up common substantive requirements. After the memoranda that Ms. Hotsford was referencing, the Money Memorandum and the Winneberger Memorandum were promulgated, in 1998, DCID 6-4 was put into place for the first time, and DCID 6-4 materially changed the standards for SCI access that were in place before then, according to DCID 1-16, which is cited in those memoranda. And one of the relevant changes is the creation of this per se ineligibility. And any suggestion that the standards are the same across the two clearance types is simply vitiated by the creation of that new regulation. The reciprocity standards follow the logical conclusion that the granting of a higher clearance implies the granting of a lower clearance, and the denial of a lower clearance implies the denial of a higher clearance. But nothing says that the denial of a higher clearance, such as SCI access, with additional requirements necessarily requires the revocation of a lower clearance. So on 503, what you're reading there is saying that's promoting reciprocity. You mean, it means promoting reciprocity where the clearance levels are the same or there was a revocation of a lower clearance. Correct, Your Honor. And the most recent of the memoranda, the 1998 memorandum, makes clear that that's the interpretation of... That's the Money Memorandum. Yes, Your Honor. Isn't that difficult to square with 501, the first full paragraph, the therefore paragraph that Ms. Hossford read to us? Your Honor, I agree that it is difficult to square. I'm not exactly sure what that paragraph means. It seems to me that that is probably among the various memos the most helpful segment for the government. Without conceding that it wins their case, you would agree probably that that's the most helpful statement. I entirely agree with that, Your Honor. And I think the problem is that as you look at JA 500, this memorandum is from 1996 before the adoption of DCID 6-4, and I think it's simply inconsistent with the actual regulations that govern reciprocity as cited in our briefs and with the differences between the actual substantive standards for adjudication between the two regulations. Thank you. Thank you, Mr. Cox, Ms. Hossford. We thank both counsel. The case is submitted.